THE PAYPHONE ASSOCIATION OF OHIO et al., Appellees;
MONTGOMERY, Atty. Gen., Intervenor–Appellee,

v.

CITY OF CLEVELAND, Appellant.

[Cite as *The Payphone Assn. of Ohio v. Cleveland* (2001), 146 Ohio App.3d 319.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78266.

Decided Sept. 24, 2001.

320

*Kegler, Brown, Hill & Ritter, Robert G. Schuler* and *Robert G. Cohen; O'Keefe, Ashenden, Lyons & Ward, Henry T. Kelly* and *John F. Ward, Jr.,* for appellees.

*Betty D. Montgomery,* Attorney General, *Arthur J. Marziale, Jr., Judith L. French* and *Elizabeth Luper Schuster,* Assistant Attorneys General, for intervenor-appellee.

*Cornell P. Carter,* Director of Law, *Richard F. Horvath,* Chief Corporate Counsel, *Gary N. Travis* and *Pamela S. Blair,* Assistant Directors of Law; *Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A., Anthony J. Garofoli* and *Scott D. Simpkins; Teamor & Associates, Ricardo B. Teamor, James C. Wrentmore, Cheryl Mackey Bayard,* for appellant.

MICHAEL J. CORRIGAN, Presiding Judge.

The city of Cleveland believes that the presence of outdoor payphones has facilitated the commission of a number of crimes, including drug transactions and prostitution. So it enacted legislation that comprehensively regulates the placement of outdoor payphones within its borders by requiring a telephone company to obtain a franchise before placing a payphone on a public right of way, and requiring permits for payphones installed on private property. The ordinance also imposes substantial limitations on the use and placement of payphones. The Payphone Association of Ohio (the "association"), a not-for-profit group representing several companies whose payphone business has been adversely affected by the legislation, brought this declaratory judgment action seeking a declaration that the city's ordinances infringed upon the sole jurisdiction of the Public Utilities Commission of Ohio ("PUCO"), which it argues has the authority to regulate telecommunications in the state of Ohio under R.C. Chapter 4939. The city counterclaimed for a declaration that R.C. Chapter 4939 is unconstitutional because it infringed on the city's home-rule powers. After considering cross-motions for summary judgment, the court declared that the city ordinances were preempted by R.C. Chapter 4939. This appeal requires us to answer questions

concerning the city's home-rule authority to promulgate legislation in an area otherwise governed by the PUCO.

The facts are undisputed. In June 1997, the city enacted the Outdoor Payphone Ordinance, Cleveland Codified Ordinance 670B. The preamble to the act states:

"WHEREAS, this Council has determined that additional regulations concerning the placement and permitting of outdoor pay telephones on private property and the right-of-way are needed to further protection of the public health, safety and welfare; and

"WHEREAS, such additional regulations are needed due to the proliferation of outdoor pay telephones in the City and the resultant increase in the congregation of persons around and about such phones, both of which have created noise, have created congestion for the public using the right-of-way, parking lots, services stations and other businesses, as well as seeking to enter and leave their own or other residences in the City, and have created aesthetic pollution and physical obstacles, blocking sightlines and causing confusion for the police, pedestrians and drivers; and such proliferation of outdoor pay telephones has also magnified the existing atmosphere conducive to the attraction of drug related crimes and criminals, prostitution, gang activity, vandalism, youth crimes and other public nuisances * * *."

To effectuate the goals of the legislation, the city banned payphones (for clarity, our references to "payphones" means outdoor payphones) on any vacant land other than a public park; on any property where there is a vacant building; on any property which has a premises licensed for the sale of alcoholic beverages (other than beer or wine); in a residential use district or within one hundred feet of a residential-use district; at a location where use from a vehicle is possible which would cause the vehicle to stand in a driveway or aisle in a parking lot or in the right of way; and on any property or location which has been determined by the director of public safety to create a nuisance based upon prior actual use. See Cleveland Codified Ordinance No. 670B.02(c).

A "nuisance" exists when (1) the payphone has been used in the commission of illegal drug transactions or other criminal activity, or substantially contributes by its presence to the commission of illegal drug transactions or other criminal activity as evidenced by significant numbers of crimes occurring in the vicinity of the payphone, (2) the existence of the payphone substantially contributes by its presence to the congregation of persons who have made loud noises and other disturbances that have disrupted persons or businesses located near the payphone, (3) the existence of the payphone substantially contributes by its presence to the congregation of persons consuming alcoholic beverages, except where the consumption is expressly authorized by state license, (4) the existence of the

payphone substantially contributes by its presence to the congregation of persons who interfere with pedestrian or vehicular traffic in the public right-of-way near the payphone, (5) usage of the pay telephone between the hours of 1:00 a.m. and 5:00 a.m. is significantly and repeatedly above normal for similarly situated payphones so as to indicate that the pay telephone is being used in the commission of illegal drug activity or other criminal activity, or (6) the pay telephone has been used to abuse the 911 system. Cleveland Codified Ordinance 670B.07(a). Any owner of a payphone that has been determined to be a nuisance may appeal that determination with the board of zoning appeals. Cleveland Codified Ordinance 670B.07(f).

All payphones are required to block automatically all incoming telephone calls and provide outgoing service only; prevent the use of pagers, use electrical wiring for electrical connections, be well lighted, and be kept clean and free of graffiti. Cleveland Codified Ordinance No. 670B.02(e). The payphones must be equipped with "smart" technology that can provide lists containing the destination of outgoing calls and the time, date, and duration of those calls. Cleveland Codified Ordinance 670B.02(f).

As applicable here, the legislation contained two essential parts: regulation of payphones on the public right-of-way and regulation of pay telephones on private property.

Any person wishing to install a payphone on the public right-of-way must first enter into a contract with the city's director of finance, after receiving approval from the city council. Cleveland Codified Ordinance 670B.03(a). Those payphone owners who do not reach an agreement with the city are required to remove their payphones at their expense. Cleveland Codified Ordinance 670B.03(c). Permission must be obtained for the placement of each individual payphone, and the member of council in whose ward the payphone is to be placed has the right to object to the placement.

All persons wishing to install a payphone on private property must obtain a biennial license, Cleveland Codified Ordinance 670B.04(a), although the possession of a license does not guarantee the licensee that a payphone installation will be permitted. Cleveland Codified Ordinance 670B.04(b). The license costs $200. Cleveland Codified Ordinance 670B.04(c). The licensee must then acquire a $60 biennial permit for each individual payphone. Cleveland Codified Ordinance 670B.05(b).

Payphones installed on private property may not be placed within one thousand feet of any other payphone on private property. Cleveland Codified Ordinance 670B.02(g). Not more than one payphone shall be installed in the right-of-way within one thousand feet of any other payphone in the right-of-way. *Id.* An owner may seek an exemption from the one-thousand-foot restriction.

All payphones installed on private property may not be located closer than five feet from any public sidewalk or within five feet of the entrance to any structure, cross-walk, bus shelter, mail box, or parking meter. Cleveland Codified Ordinance 670B.02(k). No payphone may be installed within five feet of any driveway or area used for ingress or egress, an aisleway for vehicular public parking, or an area used for parking. *Id.*

The city granted a franchise contract to only one payphone carrier—Ameritech Ohio. That contract granted Ameritech the authority to place three hundred fifty-three payphones in the public right-of-way. The city then sent notices to other owners of pay telephones informing them that their payphones located on the rights-of-way were subject to removal. The evidence shows that this notice affected five hundred sixty-two payphones located on private property. When those owners did not remove their payphones, the city began to remove them. As of July 1999, fifty payphones had been removed.

Four members of the Payphone Association of Ohio—Americall, Inc.; Nationwide Communications, Inc.; Coin Communications, Inc.; and Northeast Ohio Telephone Company—brought this action after their payphones had been removed. The court granted a preliminary injunction prohibiting the city from removing any more payphones pending resolution of the substantive issues. The parties then filed their cross-motions for summary judgment. In a detailed opinion, the court found that R.C. Chapter 4931 prohibits the state or any political subdivision from discriminating among utility service providers. The court also held that the ordinance was a police regulation outside the city's home-rule authority that conflicted with the state law and must be preempted.

## I

The city first argues that the court erred by finding that Cleveland Codified Ordinance No. 670B is not within the city's municipal powers. The city maintains that its adoption of Cleveland Codified Ordinance No. 670B was a valid exercise of its police powers.

 An ordinance constitutes a valid exercise of a city's police powers when it directly promotes the general health, safety, welfare, or morals, is reasonable; the means adopted to accomplish the legislative purpose are suitable to the end in view, the legislation is impartial in operation, the ordinance has a real and substantial relation to the legislative purpose and does not interfere with private rights beyond the necessities of the situation. *Teegardin v. Foley* (1957), 166 Ohio St. 449, 2 O.O.2d 462, 143 N.E.2d 824, paragraph one of the syllabus, quoted in *Hausman v. Dayton* (1995), 73 Ohio St.3d 671, 678, 653 N.E.2d 1190. Boiled down to its essentials, legislative action " 'must bear a real and substantial

relation to public health and welfare, and not be unreasonable or arbitrary.'" *Hausman v. Dayton,* 73 Ohio St.3d at 678, 653 N.E.2d 1190, quoting *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717.

The preamble to Cleveland Codified Ordinance 670B states that the ordinance is a law intended for the protection of the public health, safety, and welfare. The city submitted with its motion for summary judgment a number of affidavits from city council members and concerned citizens attesting to complaints of loitering, illegal drug dealing, gang activity, graffiti, prostitution, and other criminal activity occurring near and through the use of outdoor payphones. See, *e.g.,* Affidavit of Martin Sweeney, appended as Exhibit B to the city's Opposition to Plaintiff's Motion for Summary Judgment.

The association disputes the existence of any problems associated with its payphones, pointing to evidence to show that only six complaints concerning payphones were received in 1994 and ten complaints were received in 1995. The association argues that the low number of complaints cannot stand to show a problem serious enough to warrant the adoption of such stringent regulations for the placement of payphones.

 Applying the "real and substantial" test, we find that the ordinance does bear a substantial relation to the public health and welfare of the city. "Legislative concern for public safety is not only a proper police power objective—it is a mandate." *Arnold v. Cleveland* (1993) 67 Ohio St.3d 35, 47, 616 N.E.2d 163. There is no dispute that the city has broad power to pass legislation aimed at alleviating crime or other nuisances within its borders. The scope of the perceived crime problem is a matter for the city to determine, subject only to a demonstration that the city acted in a clearly unreasonable manner, adopted the ordinances in an arbitrary or capricious manner, or acted in bad faith. See *Cleveland v. Shaker Hts.* (1987), 30 Ohio St.3d 49, 53, 30 OBR 156, 159–160, 507 N.E.2d 323, 326–327. That demonstration has not been made. Even if we accept that only sixteen complaints were registered in a two-year period, the broad standard of review that we must apply would sanction the city's contention that payphones do pose a threat to the public safety and welfare sufficient to warrant the adoption of the ordinances under its police powers. It is rational to assume that the small number of complaints made is not an accurate reflection of the total number of actual incidents involving crime or nuisances at outdoor payphones in the city. Moreover, the affidavits attached to the city's motion for summary judgment do not suggest that the city lacks a good-faith basis for its claim that crime proliferates near and around outdoor payphones.

## II

The second assignment of error complains that the court erred by concluding that the city's regulation of outdoor payphones conflicted with the Ohio Public

Utilities Act. The city maintains that the Act does not regulate the placement of payphones on private property and that the ordinances do not conflict with rights-of-way provisions in the Act.

The applicable section of the Ohio Public Utilities Act is R.C. 4939.02. That section states:

"(A) A utility service provider or cable operator has the right to construct, repair, position, maintain, or operate lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities along, across, over, upon, and under any public way in the state, subject to the applicable provisions of this chapter and any other chapter of the Revised Code. The lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities shall be constructed and positioned in such a way that safety is not unreasonably compromised in the use of the public way.

"(B) The state, or any political subdivision of the state, shall not discriminate among utility service providers or cable operators, or grant a preference to any utility service provider or cable operator, in the issuance of permits or the passage of laws, ordinances, or resolutions for the use of public ways, or create or erect any requirements for entry upon and use of the public ways that are not necessary to protect the health, safety, and welfare of the public.

"(C) Nothing in this section shall be construed to authorize any utility service provider or cable operator to construct lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities along, across, upon, and under any public way owned by a political subdivision without first obtaining the consent of the political subdivision for such construction, if consent is required by the political subdivision."

The court found that the nondiscrimination provisions of R.C. 4939.02(B) preempted the city's attempt to legislate within the rights-of-way because the ordinance clearly and unequivocally prohibits the installation and use of phone equipment on the public way unless the city grants the phone company a franchise.

In *State ex rel. Mill Creek Metro. Park Dist. Bd. of Commrs. v. Tablack* (1999), 86 Ohio St.3d 293, 295, 714 N.E.2d 917, the Ohio Supreme Court stated that in order to determine whether a municipal ordinance is invalidated by a state law, "we must resolve whether (1) the challenged ordinances involve the exercise of powers of local self-government, (2) the state statutes are general or special laws, and (3) there is any conflict between the ordinances and state law. See *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 244–245, 602 N.E.2d 1147, 1149–1150; *Fairview Park v. Barefoot Grass Lawn*

*Serv., Inc.* (1996), 115 Ohio App.3d 306, 310, 685 N.E.2d 300, 302, discretionary appeal not allowed (1997), 77 Ohio St.3d 1544, 674 N.E.2d 1184."

We agree that regulation of outdoor payphones under the facts presented in this case is a proper function of the city's police power. Hence, in order to avoid being cast under the net of R.C. 4939.02, the city must argue that R.C. 4939.02 is not a general law or that the outdoor payphone ordinances do not conflict with R.C. 4939.02.

 General laws are "statutes setting forth police, sanitary or similar regulations and not statutes which purport only to grant or to limit the legislative powers of a municipal corporation to adopt or enforce police, sanitary or other similar regulations." See *W. Jefferson v. Robinson* (1965), 1 Ohio St.2d 113, 30 O.O.2d 474, 205 N.E.2d 382, paragraph three of the syllabus. "The meaning of this syllabus principle of law is that a statute which prohibits the exercise by a municipality of its home rule powers without such statute serving an overriding statewide interest would directly contravene the constitutional grant of municipal power." *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 48, 2 OBR 587, 591, 442 N.E.2d 1278. The "essence" of general laws which prevail over conflicting municipal police powers is that which involves " * * * the concern of the state for the peace, health and safety of all its people, wholly separate and distinct from, and without reference to, any of its political subdivisions * * *." *Fitzgerald v. Cleveland* (1913), 88 Ohio St. 338, 359, 103 N.E. 512. In *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 11, 716 N.E.2d 1121, the Ohio Supreme Court stated:

 "General laws are defined as those 'operating uniformly throughout the state * * *, which prescribe a rule of conduct upon citizens generally, and which operate with general uniform application throughout the state under the same circumstances and conditions.' *Garcia* [*v. Siffrin Residential Assn.* (1980), 63 Ohio St.2d 259] at 271, 17 O.O.3d [167] at 174, 407 N.E.2d [1369] at 1377–1378, citing *Leis v. Cleveland Ry. Co.* (1920), 101 Ohio St. 162, 128 N.E. 73."

 The courts are sensitive to the home-rule authority of municipalities because a disregard of that authority would be an effective nullification of the constitutional right. The kinds of general laws that prevail over conflicting powers of home-rule authority municipalities are those that show a "concern of the state for the peace, health and safety of all of its people, wholly separate and distinct from, and without reference to, any of its political subdivisions—such as those which regulate the morals of people, the purity of their food, the protection of the streams, the safety of buildings and similar matters." *Fitzgerald v. Cleveland,* 88 Ohio St. at 359, 103 N.E. at 517–518.

██ The General Assembly has declared the placement of telecommunications equipment to be "a matter of statewide concern." See R.C. 4939.02(E). Although a statement of legislative intent that issues addressed within a law are matters of statewide concern is not necessarily dispositive on that point, we do afford the General Assembly's determination deference under the circumstances. State control over utilities has been the norm in Ohio. In *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766, paragraph three of the syllabus states, "Legislation enacted by the state pursuant to the police power, in relation to the public health, is valid as applied to the municipal operation of a public utility under Section 4 of Article XVIII of the Ohio Constitution, where such legislation does not interfere with the ownership or operation of the utility."

██ We are sympathetic to the city's argument that control over its public ways is a purely local issue, unrelated to the state's need for uniform laws. This seems particularly true when the stated purpose of the ordinances is to alleviate crime occurring as a result of the placement of payphones. Certainly, R.C. 4939.02 fails to meet the "morals of the people, the purity of their food, the protection of the streams, the safety of buildings and similar matters" language set forth so long ago in *Fitzgerald*. Political subdivisions have particular interests apart from those of "statewide concern" that might lead to the conclusion that the state law is not general in a sense normally contemplated by historical precedent.

Nevertheless, the city's argument, at best, suggests that regulation of payphones presents a mixed concern between state and local governmental interests. We resolve this conflict in favor of the state's larger interest in maintaining uniformity of access and service in both interstate and intrastate communications. We find that R.C. Chapter 4939 is a general law.

The remaining consideration is whether the ordinance conflicts with the general law. In *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 11, 716 N.E.2d 1121, the Ohio Supreme Court cited paragraph two of the syllabus to *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, and stated, "The test to determine when a conflict exists between a municipal ordinance and a general law of the state is 'whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' "

The court found that the entirety of Cleveland Codified Ordinance 670B conflicted with the general law. We only agree in part with this conclusion.

Cleveland Codified Ordinance 670B.03(a) states that the city's director of finance shall have the authority to enter into contracts that grant "one or more owners" the privilege of installing and maintaining payphones in the public right-of-way. To date, only one franchise has been granted to a payphone operator

despite each of the individual member's of the association making separate applications. No justification for this appears in the record, and we fail to discern any valid reasons for awarding only one franchise.

■ We find it beyond debate that the city's refusal to grant more than one franchise has had the effect of creating a barrier to entry in the payphone market in a manner that would violate R.C. 4939.02(B). The city is not allowed to discriminate among utility service providers when issuing licenses, and no rational reasons have thus far been produced that would justify granting a license to Ameritech to the exclusion of all other applicants. This is particularly so when nothing in the record shows that other payphone operators who had existing payphones installed in the city were unable to operate within the ordinance. For this reason alone, we find a conflict with the general law. The desire for open competition among utility providers is too well established at this point to justify closing the payphone market to all but one provider.[1]

■ We cannot agree, however, with the court's decision to invalidate Cleveland Codified Ordinance 670B in its entirety merely because the city discriminated by refusing to issue more than one franchise. The city's attempt to discriminate against payphone operators has been a complete obstacle—it does not mean that other provisions in the ordinance have the same effect. The court made no findings that each and every provision of the ordinance conflicted with the general law. Some of those provisions appear, at least facially, to be related to the health, safety, and welfare of the public. For example, the requirement that payphones be equipped with so-called "smart" technology does not appear to be a kind of discrimination against payphone operators, since we can think of colorable

---

1. We recognize the impact of the Federal Telecommunications Act, Section 253, Title 47, U.S.Code, addressed in the supplemental authority provided by the association. That section has been interpreted by the Federal Communications Commission in *In the Matter of Classic Telephone, Inc.* (1996), 11 FCC 13082, as proscribing "State and local legal requirements that prohibit all but one entity from providing telecommunications services in a particular State or locality." See, also, *AT&T Communications v. Dallas* (N.D.Tex.1998), 8 F.Supp.2d 582, 591 ("Municipalities therefore have a very limited and proscribed role in the regulation of telecommunications."); *Bell Atlantic–Maryland v. Prince George's Cty.* (D.Md.1999), 49 F.Supp.2d 805, 814, vacated and remanded on other grounds (C.A.4, 2000), 212 F.3d 863 (Section 253[a] preempts "regulations that not only 'prohibit' outright the ability of any entity to provide telecommunications services, but also those that 'may * * * have the effect of prohibiting' the provision of such services."); *New Jersey Payphone Assn. v. Town of West New York* (E.D.N.J.2001), 130 F.Supp.2d 631, 637 (court "unable to see how selling off the exclusive right to provide pay phones to the highest bidder bears any rational relationship to the interest identified by the Town or to any other interest that the Town may legitimately advance pursuant to the savings clause of section 253[c]").

We cannot, however, rely on this federal statute as grounds for our decision, since the association did not raise federal law as a ground for relief in its complaint.

arguments that would support a finding that smart technology is intended to advance the health, safety, and welfare of the citizens near those payphones.

We are likewise concerned with the court's decision to invalidate the nuisance provisions of the ordinance. Again, it seems to us highly unlikely that declaring an existing payphone to be a nuisance would amount to discrimination under R.C. 4939.02(B), since the installation of a payphone at a particular site would be a necessary predicate before a payphone could be declared a nuisance. In any event, the declaration of intent in Cleveland Codified Ordinance 670B clearly establishes the city's concern over crime occurring at or near payphones. This would appear to be a legitimate ground for local regulation.

Our list is not meant to be exhaustive. We recognize that many of these issues will not be ripe for review until after the city opens its payphone market to all other providers in conformity with this opinion. For now, it will suffice to say that the court acted precipitously by invalidating the ordinance in its entirety without considering whether individual portions of the ordinance would not conflict with the general law.

We therefore sustain in part the city's second assignment of error and remand this case to the court for a determination of whether individual sections of the ordinance conflict with R.C. 4939.02(B).

The city's remaining arguments raise constitutional issues in one form or another—questions concerning the one-subject rule under Section 15, Article II of the Ohio Constitution and questions about the Uniformity Clause in Section 26, Article II of the Ohio Constitution. The court did not address these issues under longstanding principles that the courts will avoid reaching constitutional issues if it can decide the case on other grounds. See *In re Miller* (1992), 63 Ohio St.3d 99, 110, 585 N.E.2d 396, 405. We agree with the court and find it unnecessary to consider at this time the constitutional questions presented by the city.

Affirmed in part, reversed in part, and cause remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

TERRENCE O'DONNELL, J., concurs.

ANNE L. KILBANE, J., concurs separately.

ANNE L. KILBANE, Judge, concurring separately.

On this appeal from the decision of Judge Bridget M. McCafferty, I agree with the majority that the city's exclusive grant of a franchise to Ameritech alone requires reversal and that the case should be remanded for each section of Cleveland Codified Ordinances ("C.C.O.") 670B to be separately evaluated for

adherence to the limits of the city's home-rule authority. I write separately, however, because it is a logical inconsistency to decline to address the constitutionality of R.C. Chapter 4939 while at the same time applying it to the city's detriment in ruling that C.C.O. 670B conflicts with R.C. Chapter 4939, a "general law" containing an antidiscrimination provision.

The city's counterclaim in this declaratory judgment action asserted that C.C.O. 670B was enacted under its home-rule powers and, regardless of whether its provisions conflicted with those of R.C. Chapter 4939, that statute was created in violation of the "one subject" provision of the Ohio Constitution and should be invalidated *in toto*.

Courts find it unnecessary to address constitutional issues where the party raising that issue can prevail on other grounds, making constitutional decisions unnecessary because any assumed constitutional infirmity does not prejudice the complaining party.[2] The majority, however, chooses to ignore the city's constitutional issue of whether R.C. Chapter 4939 is valid, despite knowledge that its application results in a partially injurious result for the city. In this case, the constitutional issues should be decided before the statute is actually applied.

Ohio has adopted the "one subject rule," through Section 15(D), Article II of its Constitution, in order to prevent state legislators from combining unrelated issues in one bill because such a practice prevents legislators from fully voting their position on each major issue and promotes pork-barrel politics. It also prevents groups of minority blocs from voting for a bill in order to secure passage of one tiny part of the bill they support—a practice known as "logrolling."

"With these principles in mind, [the Ohio Supreme Court has] adopted the position that 'the one-subject provision is not directed at plurality but at disunity in subject matter.'[3] * * * Thus, '[t]he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics.'[4] * * * However, 'when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical

---

2. *State ex rel. Hayburn v. Kiefer* (1993), 68 Ohio St.3d 132, 624 N.E.2d 699; *State ex rel. Crabtree v. Ohio Bur. of Workers' Comp.* (1994), 71 Ohio St.3d 504, 644 N.E.2d 361.

3. *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 146, 11 OBR 436, 440–441, 464 N.E.2d 153, 158. See, also, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 148, 580 N.E.2d 767, 770.

4. *Hoover v. Franklin Cty. Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580; *State ex rel. Ohio AFL–CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 229, 631 N.E.2d 582, 586.

reasons, *i.e.*, logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purpose of the rule.' "[5, 6] (Footnotes added.)

R.C. Chapter 4939, consisting of four sections, was enacted in 1999 as part of the General Assembly's biennial operating appropriations legislation.[7] It deals with the restrictions and licensing requirements political subdivisions may place upon any utility or cable provider within that subdivision. That portion of the Act, which also repealed R.C. 4931.01, 4931.03, 4931.20, 4931.23, and 4931.24, does not have any relationship with the state budget, the allotment of state funds, or the organization of state agencies, which are the subjects of the super-majority of the eight–hundred–fifty–five–page bill. R.C. Chapter 4939 can be fairly characterized as a special law, an unconnected rider improperly included in the bill, and must be invalidated.

"[W]hen a court strikes down a statute as unconstitutional, and the offending statute replaced an existing law that had been repealed in the same bill that enacted the offending statute, the repeal is also invalid unless it clearly appears that the General Assembly meant the repeal to have effect even if the offending statute had never been passed."[8] The precursor statutes to R.C. Chapter 4939 are found in R.C. Chapter 4931, and the judge should have evaluated C.C.O. 670B as a valid use of the city's constitutional police power against the backdrop of the relevant sections of R.C. Chapter 4931 that were replaced by R.C. Chapter 4939.[9]

---

**5.** *Dix*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. See, also, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507; *Hinkle, supra*, 62 Ohio St.3d at 148–149, 580 N.E.2d at 770; *Hoover, supra*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580.

**6.** *State ex rel. Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 496–497, 715 N.E.2d 1062, 1100.

**7.** 147 v Am.Sub.H.B. No. 283.

**8.** *State v. Sullivan* (2001), 90 Ohio St.3d 502, 509, 739 N.E.2d 788, 794; see, also, *State v. McClay* (July 19, 2001), Cuyahoga App. No. 78432, unreported, 2001 WL 824413.

**9.** R.C. 4931.20 states: "Any company owning and operating a telephone exchange or doing a telegraph business, in any municipal corporation in this state, may construct and maintain underground wires, pipes, conduits, and other fixtures for containing, protecting, and operating such wires, in the streets and public ways of such municipal corporation, when the consent of such municipal corporation has been obtained. Any ordinance of any village purporting to grant the right or privilege to any telephone or telegraph company to construct and maintain underground wires and pipes, conduits, and other under ground fixtures for containing, protecting, and operating such wires, in the streets and public ways of such village, when such grant has been accepted, or when money has been expended in good faith on account thereof, is valid and effective." R.C. 4931.23 states: "Consent of a municipal corporation to the construction and maintenance of under ground wires, pipes, conduits, and

Expressly stated in R.C. 4939.02(E), but notably absent from R.C. Chapter 4931 before its alteration, is the preemption of any municipal home-rule powers due to a legislatively professed reservation of outdoor pay telephone regulation as a "state-wide concern." [10] R.C. Chapter 4931 had explicitly delegated regulation of such issues to municipalities in requiring "consent" before a utility could construct fixtures or lines within a city's limits.

The Ohio Attorney General attempts to gloss over the fatal flaws of the legislation by suggesting that the "common purpose" element of the single–subject analysis was satisfied because R.C. 4939.03 "removed a funding source" from local governments by prohibiting a fee, tax, or charge for a utility or cable provider's use of a public way and, therefore, "changed the amount of funding that would be available to local governments * * *." As the appropriations bills provide for a certain level of funding for local governments during the biennium and, therefore, add funding to the local governments, the Attorney General boldly asserts that this too is a "change in funding" and, Q.E.D., the "common purpose." Logrolling, however semantically disguised, is still "the very evil the one-subject rule was designed to prevent." [11]

In this case, the only necessary inquiry would be to determine whether each section of C.C.O. 670B, as enacted or enforced, oversteps the bounds of the city's full home-rule powers.

---

other fixtures, by a company owning and operating a telephone exchange or doing a telegraph business, shall be given by the legislative authority of such municipal corporation."

10. "The construction, repair, placement, maintenance, or operation of lines, poles, pipes, conduits, ducts, equipment, and related appurtenances and facilities by a utility service provider or a cable operator is declared to be a matter of statewide concern."

11. *State ex rel. Dix v. Celeste*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157.